# Exhibit 1

THE HONORABLE _____

```
_____ FILED    _____ ENTERED
_____ LODGED   _____ RECEIVED

        JUL 0 8 2025   MH

              AT SEATTLE
        CLERK U.S. DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY
```

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| QueerDoc, PLLC,<br><br>                    Movant,<br><br>          v.<br><br>U.S. Department of Justice,<br><br>                    Respondent. | Case No.    2:25-mc-00042-JNW<br><br>Declaration of Dr. Crystal Beal, M.D.,<br>in Support of QueerDoc, PLLC's<br>Motion to Quash<br><br>**FILED UNDER SEAL** |

Pursuant to 28 U.S.C. § 1746, I declare in this Unsworn Declaration of Dr. Crystal Beal, M.D., the following to be true and correct under penalty of perjury:

1.    My name is Dr. Crystal Beal.  My business address is 600 1st Ave Ste 330, PMB73332, Seattle, WA 98104.  I am over eighteen (18) years old, and am legally competent to make this Declaration, which is true and correct, based on my personal knowledge, and made positively, voluntarily, and not under duress.

2.    I submit this declaration in support of QueerDoc, PLLC's ("QueerDoc") Motion to Quash the subpoena issued by the U.S. Department of Justice ("DOJ"), dated June 11, 2025 ("Subpoena").

3.    I am a board-certified medical doctor in family medicine.

4.    I received my medical degree from the Florida State University College of Medicine, and  completed residency training at Valley Family Medicine Residency Program.

5.    I have completed extensive additional training in sexual health, LGBTQ+ health, and

DECL. OF DR. CRYSTAL BEAL, M.D.
(No. _____)

gender affirming care including self-study, continuing medical education trainings, and shadowing experts in the community.

6.    I am a Clinical Instructor at the University of Washington School of Medicine and have advised a large regional medical center on its adolescent gender clinic protocols.

7.    I regularly provide continuing education trainings on gender affirming care, and provide trainings on topics relating to sexual health and LGBTQ+ health. I am frequently hired to train organizations on these topics.

8.    I am the Chief Executive Officer of QueerDoc, which I founded in 2018 to raise the bar in gender affirming care and improve transgender and gender diverse lives through telemedicine-based direct clinical services.

9.    In total, QueerDoc's providers are licensed to practice in ten states, including Washington.

10.    QueerDoc providers offer gender affirming care including non-medical and medical interventions. QueerDoc does not offer any surgical interventions.

11.    Apart from me, QueerDoc employs only one other individual, who works in an administrative capacity. QueerDoc does not have an information technology department.

12.    As such, in order to comply with the Subpoena, QueerDoc would need to retain a discovery vendor, as well as invest additional resources into legal services, which would be a significant added expense.

13.    For example, QueerDoc's patient portal hosts over 2,500 patient records, totaling thousands, if not hundreds of thousands, of pages.

14.    Compliance with the Subpoena would also require that I shift my focus from providing healthcare services to patients and otherwise running QueerDoc's business operations to managing document productions in response to the Subpoena.

15.    In addition to reviewing and producing the significant number of patient records (and other documents) requested by the Subpoena, production of those records would also require taking additional steps to ensure compliance with the privacy laws in the ten states in which QueerDoc

DECL. OF DR. CRYSTAL BEAL, M.D. - 2
(No. _____)

provides medical services. In Washington, for example, I would be required to compile "an accounting of disclosures of health care information" for each of the Washington patient files I produce to DOJ, and then make that accounting available to each patient in Washington upon request. *See* Wash. Rev. Code § 70.02.20(2).

16.    Compliance with the Subpoena would be a significant disruption to QueerDoc's day-to-day operations, which are managed solely by one administrative employee and me.

17.    Indeed, the financial and operational costs of full compliance would seriously threaten QueerDoc's ability to remain in business.

18.    In addition to the financial and operational burdens of complying with the Subpoena, if QueerDoc were forced to produce patient records, it would substantially harm the doctor-patient relationship and the overall viability of QueerDoc's business. Patients would likely seek new providers or terminate treatment altogether out of fear that their private health information may be exposed.

19.    This chilling effect would also seriously threaten QueerDoc's ability to continue operations.

DECL. OF DR. CRYSTAL BEAL, M.D. - 3
(No. _____)

1

2

3    I declare under penalty of perjury under the laws of the United States of Ame

4    is true and correct.

5

6

7        Executed this ᘯth day of July, 2025 in Seattle, Washington.

8

9

10               Dr. Crystal Beal, M.D.

11

12

13

14

15

16

17

18

# Exhibit 2

THE HONORABLE _____

1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
9    AT SEATTLE

10

11   QueerDoc, PLLC,                          Case No.      2:25-mc-00042-JNW

                    Movant,
12
                                              Declaration of Paula R. Ramer, Esq. in
13         v.                                 Support of QueerDoc, PLLC's Motion
                                              to Quash
14   U.S. Department of Justice,
                                              **FILED UNDER SEAL**
15                  Respondent.

16

17   I, PAULA R. RAMER, ESQ., hereby declare as follows:

18         1.      My name is Paula R. Ramer. My business address is 250 West 55th Street, New York,

19   NY 10019. I am an attorney at law in the state of New York, where I am a member in good standing

20   of the bar. I am a partner at the New York office of Arnold & Porter Kaye Scholer LLP ("Arnold &

21   Porter"). Arnold & Porter represents QueerDoc, PLLC ("QueerDoc") in connection with this matter.

22         2.      I submit this declaration in support of QueerDoc's Motion to Quash the subpoena

23   issued by the U.S. Department of Justice ("DOJ"), dated June 11, 2025 (the "Subpoena"). This

24   Declaration is made on personal knowledge.

25         3.      Exhibit 3 is a true and correct copy of the subpoena issued to QueerDoc on June 11,

26   2025 by DOJ's Consumer Protection Branch and signed by Assistant Attorney General Brett Shumate.

27

28   DECL. OF PAULA R. RAMER, ESQ.                        **Arnold & Porter**
     (No. _____)                                    601 Massachusetts Ave, NW
                                                          Washington, DC 20001-3743
                                                          Telephone: +1 202.942.5000

4.      The Subpoena follows an April 22, 2025 memorandum by Attorney General Pamela J. Bondi ("Bondi Memo") and a June 11, 2025 memorandum by Assistant Attorney General for the Civil Division Brett Shumate ("Shumate Memo"), each directing investigations into gender affirming care. Exhibits 4 and 5 are true and correct copies of the Bondi Memo and the Shumate Memo, respectively.

5.      On June 26 2025, after being formally retained to represent QueerDoc in this matter, I contacted the three DOJ Consumer Protection Branch attorneys listed on the subpoena via email, asking to confer regarding the Subpoena.  One of them replied promptly, and we agreed to meet via videoconference later that day.

6.      Later that afternoon, Jaclyn Machometa, a senior associate at Arnold & Porter, and I met via Webex with two of the three attorneys listed on the Subpoena as well as with an official I understood to be the Deputy Assistant Attorney General for the Consumer Protection Branch (the "DOJ attorneys").  I began the call by explaining that Arnold & Porter had just been retained to represent QueerDoc in this investigation, and I asked if the DOJ attorneys could explain the basis for the investigation.  One of the DOJ attorneys referenced the Executive Orders issued by the President on January 20 and 28, 2025, and the Bondi Memo, and stated that they had been tasked with investigating potential violations of the Food, Drug and Cosmetic Act ("FDCA").  They also stated that they had been asked to make "frequent and extensive reports" to DOJ "senior leadership."

7.      I then asked whether the DOJ attorneys had specific concerns regarding QueerDoc. One of the DOJ attorneys replied that they are aware that QueerDoc is a "prominent" provider of gender affirming care through telehealth that prescribes puberty blockers and hormones "under the FDCA" but added, "that's the extent of it."

8.      Regarding the Subpoena's July 9, 2025 return date, one of the DOJ attorneys said that they could not grant an extension and that, although they did not expect production to be complete by that date, they would require QueerDoc to begin producing documents by that date.

9.      On July 7, 2025, I contacted the DOJ attorneys via email, asking to confer regarding the Subpoena.  One of them replied promptly, and we agreed to meet via videoconference the next day.

DECL. OF PAULA R. RAMER, ESQ. - 2
(No. _____)

**Arnold & Porter**
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.5000

1    10.    On July 8, 2025, Ms. Machometa and I met via Zoom with the DOJ attorneys.  I began
2    the call by asking whether they would withdraw the Subpoena, and they said they would not.  I replied
3    that, in that case, we would be filing a motion to quash in federal district court in the Western District
4    of Washington.  I also explained that we intended to file the motion under seal, and asked for their
5    position.  They said they would oppose sealing the motion to quash.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    DECL. OF PAULA R. RAMER, ESQ. - 3
     (No. _____)

Arnold & Porter
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.5000

1   I declare under penalty of perjury under the laws of the United States of America that the foregoing is

2   true and correct.

3

4   Dated July 8th, 2025                                    Paula R. Ramer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   DECL. OF PAULA R. RAMER, ESQ. - 4
     (No. _____)

# Exhibit 3

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

---◆·◆·◆---

## SUBPOENA DUCES TECUM

### No. 25-1431-012

**To:**   Queer Doc PLLC, c/o Registered Agent: Sharon K. Coggins
348 17th Avenue
Seattle, Washington 98122-5707

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

United States Attorney's Office, 700 Stewart Street, Suite 5220, Seattle, Washington
on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)



IN TESTIMONY WHEREOF

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

**BRETT SHUMATE**
Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:07:35 -04'00'

*(signature)*

*RETURN OF SERVICE*

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1. *Personal delivery to an individual, to wit:*

_____
*(name)*

_____
*(title)*

_____
*(address)*

2. *Personal delivery to an address, to wit:*

_____
*(description of premises)*

_____
*(address)*

3. *Registered or certified mailing to:*

_____
*(name)*

_____
*(address)*

At _____ a.m. | p.m. on

_____
*(date)*

_____
*(signature)*

_____
*(title)*

**UNITED STATES OF AMERICA**
**DEPARTMENT OF JUSTICE**

**SUBPOENA DUCES TECUM**

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

# ATTACHMENT A TO SUBPOENA TO:

QUEER DOC PLLC
C/O REGISTERED AGENT: SHARON K. COGGINS
348 17TH AVENUE
SEATTLE, WASHINGTON 98122-5707

## I.  DEFINITIONS

1.      "You," "Your Company," "the Company," and "Queer Doc" means:

   a.      Queer Doc PLLC., a Washington professional limited liability company, whose principal mailing address is: 113 Cherry Street, Seattle, Washington, 98104-2205, without regard to any name under which it has done business;

   b.      All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part; and

   c.      Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority, including without limitation: Crystal Joy Beal; Stetson Jo Aman; Lin-Fan Wang; Courtney Lee Rawls; Nora Gause; and Kai Mai.

2.      "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.      "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a.      All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

b.      Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.      Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.      Any electronic files saved as a backup, including metadata;

e.      Any deleted but recoverable electronic files, including metadata;

f.      Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.      Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.      All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.      "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.      "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.      "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.      "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

2

8.    "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.    "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10.   "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11.   "Hormones" includes testosterone, estrogen, and any other hormonal drugs (*e.g.,* estradiol, testosterone) used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12.   "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.


## II. GENERAL INSTRUCTIONS

1.    You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

a.    If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

b.    If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

2.   **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3.   Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

a.   Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

b.   The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

c.   The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.   The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.   If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.   The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.   All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8.  If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

a.  The name and title of the author (and if different, the preparer and signatory);

b.  The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.  The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.  The date of the document;

e.  The number of pages;

f.  A brief description of the subject matter;

g.  A statement of the specific basis on which privilege is claimed; and

h.  The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.  Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.  All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.  All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

4.      All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.      All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.      Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.      All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.      All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.      All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10.     All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11.     Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12.     For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13.     All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

6

approved by the United States Food and Drug Administration) and potential risks.

14.    All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15.    All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

## SUBPOENA ATTACHMENT B

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

**1.    Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2.    Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto.  The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties.  No alteration shall be made to file names or extensions for responsive native electronic files.  If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction..  Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file.  Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

   a.   **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

   b.   When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

*July 2022*

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

    ii. All TIFF image files shall be stored with the ".tif" extension.

    iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

> REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
> REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
> REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
> REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
> REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

   | | |
   |---|---|
   | *Field Separator* | *¶ or Code 020* |
   | *Text Qualifier* | *þ or Code 254* |
   | *Newline* | *® or Code 174* |
   | *Multi-value* | *; or Code 059* |
   | *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

   þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

   *\CaseName*\**LoadFiles**
   *\CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   *\CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   *\CaseName*\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

*July 2022*

\\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13).  Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

4

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

### 4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

*July 2022*

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

  a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.
  b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

  a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
  b.  The first document in the collection represents the parent document and all other documents will represent the children.
  c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
  d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number.  *See* section 22 below.

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

*July 2022*

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

    a.    AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

    b.    GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

    c.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
    b.  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    c.  Government approved File Transfer Protocol (FTP) technologies.
    d.  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    e.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

*July 2022*

### 25. Privilege Logs

a.   The name and title of the author (and if different, the preparer and signatory);
b.   The name(s) and title(s) of the individual(s) to whom the document was addressed;
c.   The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d.   The date of the document;
e.   The number of pages;
f.   A brief description of the subject matter;
g.   A statement of the specific basis on which privilege is claimed; and
h.   The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

# Exhibit 4



# Office of the Attorney General
## Washington, D. C. 20530

April 22, 2025

MEMORANDUM FOR SELECT COMPONENT HEADS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 PREVENTING THE MUTILATION OF AMERICAN CHILDREN

There is a radical ideological agenda being pushed throughout every aspect of American life—from TV programming and Hollywood film production to children's books and elementary school classrooms—that teaches children to deny biological reality. Gender ideology, masked as science, teaches that children should process adolescent stress and confusion as a case of mistaken identity and that the solution is not to root out and eliminate the underlying condition but to acquiesce in it permanently through life-altering chemical and surgical intervention. That ideology, pushed by far-left politicians, celebrities, politically captured academics, and legacy media, has infected an entire generation of children, who have in turn pushed transgenderism on their peers through social media and other means. Dissenting voices are bullied into silence, and "allies" are praised and rewarded. Tragic and absurd as it is that 1.4% of 13- to 17-year-olds now identify as transgender,[1] that is the predictable result of a coordinated, unchecked ideological attack on America's children.

The medical community, with its roots in hard science, is well-positioned to serve as a bulwark against this sociological disease. And indeed, parents who are desperate to help their confused, frustrated children have understandably turned to medical professionals for help. Unfortunately, those parents have been betrayed by politically captured profiteers at every step. These "professionals" have deployed junk science and false claims about the effects of so-called "gender-affirming care" to justify the barbaric practice of surgically and chemically maiming and sterilizing children. Between 2019 and 2023, an estimated 14,000 children received "treatment" for gender dysphoria, with more than 5,700 subjected to life-altering surgeries.[2] The practitioners who provided this so-called "care" profited while their patients were left permanently disfigured, scarred, and sterilized. Those children will struggle for the rest of their lives to overcome regret, and their parents will struggle equally to overcome the guilt of ruining their children's lives on the

---

[1] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, N.Y. Times (June 10, 2022), https://www.nytimes.com/2022/06/10/science/transgender-teenagers-national-survey.html.

[2] Rikki Schlott, *Over 5,700 American children had trans surgery between 2019 and 2023, medical group claims: 'Treated like guinea pigs,'* N.Y. Post (Oct. 8, 2024), https://nypost.com/2024/10/08/us-news/over-5700-americans-under-18-had-trans-surgery-from-2019-23/.

false and misleading advice of medical providers who told them that surgery or hormone replacement was the best solution to their problems.[3]

Consider the case of Chloe Cole, whose story, sadly, is not unique.[4]  At just 11 years old, Chloe joined Instagram and was bombarded with "LGBT content and activism."[5]  She "saw how trans people online got an overwhelming amount of support," and that "really spoke to [her] because, at the time," she was just a child and "didn't really have a lot of friends of [her] own."[6]  She was especially vulnerable at that age because, like many young girls, Chloe felt that her "body didn't match beauty ideals," so she "started to wonder if there was something wrong with" her, even wondering whether she would "be better off as a boy."[7]  By the age of 12, Chloe identified as transgender, and she "was fast-tracked through her entire transition—from blockers to a mastectomy—in just two years."[8]  "The only pushback she . . . encountered came from the first endocrinologist she saw," but she bypassed that easily by going "to another doctor who gave her the prescription with no trouble."[9]  Despite the "vitriol from the transgender activist community," Chloe has bravely shared her regret with the world at just 17 years old because she simply "can't let this happen to other kids."[10]  Neither can I, and neither can President Trump.

The Biden administration bears enormous responsibility for the medical community's fraud and exploitation of parents and children who have fallen prey to radical gender ideology. President Biden personally advanced the agenda by hosting transgender activist influencers like Dylan Mulvaney at the White House,[11] opposing state-level bans on gender-affirming care for minors,[12] threatening legal action against Medicaid and Obamacare providers who fail to offer

---

[3] *See, e.g.*, Dr. Marc Siegel et al., *Detransitioning becomes growing choice among young people after gender-affirming surgery*, Fox News (Dec. 19, 2022), https://www.foxnews.com/health/detransitioning-becomes-growing-choice-young-people-gender-affirming-surgery.

[4] Chloe Cole, *Hearing on Gender Affirming Care before the Subcommittee on the Constitution and Limited Government of the H. Judiciary Comm.*, 118th Cong. (2023).

[5] Rikki Schlott, *'I literally lost organs:' Why detransitioned teens regret changing genders*, N.Y. Post (June 19, 2022), https://nypost.com/2022/06/18/detransitioned-teens-explain-why-they-regret-changing-genders/.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Emma Colton, *Biden legacy includes relentless push for transgender agenda*, Fox News (Dec. 8, 2024), https://www.foxnews.com/politics/biden-legacy-includes-relentless-push-transgender-agenda.

[12] Edie Heipel, *In interview with trans activist, Biden condemns states banning sex changes on kids*, (Oct. 24, 2022), Catholic News Agency, https://www.catholicnewsagency.com/news/252633/in-interview-with-trans-activist-biden-condemns-states-banning-sex-changes-on-kids.

such care,[13] and appointing Rachel Levine—a leading transgender activist who personally identifies as transgender—to serve as Assistant Secretary for Health. Under Levine, the Department of Health and Human Services promoted gender-reassignment surgeries and hormone replacement for the treatment of gender dysphoria in minors[14] and pressured the World Professional Association for Transgender Health ("WPATH") to eliminate age minimums for reassignment surgeries in its 2022 guidelines.[15] All the while, NIH-funded studies admitted that "little to no empirical data" supported the long-term safety of puberty blockers and hormones, let alone sex-reassignment surgery.[16] To address the lack of scientific support for his agenda, President Biden allocated more than $8 million of taxpayer funds for transgender hormone studies on mice.[17]

President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies. Pursuant to the President's directive, I am issuing the following guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents.

## I.    Enforcement of Laws Outlawing Female Genital Mutilation

The Department of Justice will not sit idly by while doctors, motivated by ideology, profits, or both, exploit and mutilate our children. Under my watch, the Department will act decisively to protect our children and hold accountable those who mutilate them under the guise of care. I am putting medical practitioners, hospitals, and clinics on notice: In the United States, it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ("FGM") on any person under the age of 18.[18] That crime carries a maximum prison sentence of 10 years per count.[19] I am directing all U.S. Attorneys to investigate all suspected cases of FGM—under the

---

[13] Executive Order 14075, *Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals*, 87 Fed. Reg. 37189 (June 15, 2022).

[14] Timothy Nerozzi, *Biden administration endorses transgender youth sex-change operations, 'top surgery,' hormone therapy*, Fox News, March 31, 2022, https://www.foxnews.com/politics/biden-administration-transgender-agenda-youth-sex-change-hormone-therapy.

[15] Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. Times (June 25, 2024), https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html.

[16] Patrick Hauf, *Biden administration funds studies on danger of transgender hormonal treatments even as it pushes them on kids*, Fox News, (Oct. 20, 2022), https://www.foxnews.com/politics/biden-funds-studies-dangers-transgender-hormone-treatments.

[17] The White House, March 5, 2025, https://www.whitehouse.gov/articles/2025/03/yes-biden-spent-millions-on-transgender-animal-experiments/.

[18] *See* 18 U.S.C. § 116(a)(1).

[19] *Id.* § 116(a).

banner of so-called "gender-affirming care" or otherwise—and to prosecute all FGM offenses to the fullest extent possible.

The Department will also ensure that victims and their families are able to report violations to federal law enforcement to expose violators and receive support.  The Federal Bureau of Investigation, alongside federal, state, and local partners, will pursue every legitimate lead on possible FGM cases.

## II.    Investigation of Violations of the Food, Drug and Cosmetic Act and False Claims Act

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations.  To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition."  Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling.[20]

- I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation.  Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (e.g., gender dysphoria) but reporting a legitimate purpose (i.e., early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure. Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

- I am also notifying the public that the Department is eager to work with *qui tam* whistleblowers with knowledge of any such violations.  The False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government.  In meritorious cases, the Department of Justice can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery.  In 2024 alone, *qui tam* relators received a $344 million share of victories won by the Department.  For more information about initiating a *qui tam* action,       please       visit       the       Department's       website       at

---

[20] *See* 21 U.S.C. §§ 321(m)-(n), 331, 352(a), (f); 21 C.F.R. §§ 201.100, 201.128, 202.1(l)(2).

https://www.justice.gov/archives/jm/criminal-resource-manual-932-provisions-handling-qui-tam-suits-filed-under-false-claims-act.

## III.    Ending Reliance on Junk Science by the Department

Consistent with Section 3 of the President's Order, the Civil Division has already directed that Department employees shall not rely on the ideologically driven WPATH guidelines, and that they should withdraw all court filings that rely on WPATH's guidelines in any case in which the Department of Justice is actively involved, whether as a party, an amicus, or through the submission of a statement of interest.  For the avoidance of doubt, I now expressly extend that direction to all Department employees.  I further direct the Civil Rights Division to work with the Civil Division to identify and purge all Department policies, memoranda, and publications and court filings based on WPATH guidelines.  WPATH has flouted basic standards for clinical guidelines, silenced its own evidence review team to bury doubts about the science WPATH promotes, muzzled dissenting members, and worked with the prior administration to push reckless policies—like doing away with age minimums for child surgeries.[21]  That is not science; it is radical ideology that endangers children with untested theories, and it has no place in the Department's work.  WPATH's guidelines are fundamentally flawed and unreliable, and the Department will not use them in any way that suggests otherwise.

## IV.    Establish Federal and State Coalition Against Child Mutilation

Federal law enforcement must stand ready to assist states that prioritize children's health over ideology.  Accordingly, the Department is launching the Attorney General's Coalition Against Child Mutilation.  Through this Coalition, I will partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices.  The Department will support the state-level prosecution of medical professionals who violate state laws that protect children, such as Alabama's Vulnerable Child Compassion and Protection Act,[22] which makes it a felony for doctors to treat children with puberty blockers or hormones to affirm a gender identity inconsistent with biological sex.

## V.    Promoting New Legislation Protecting Children

I have instructed the Office of Legislative Affairs ("OLA") to draft legislation creating a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals through chemical and surgical mutilation.  The proposed legislation will establish a long statute of limitations and retroactive liability, so that no one providing such "treatment" will escape liability.  The Department of Justice will work with members of the House and Senate Judiciary Committees to bring this bill to President Trump as soon as possible.  Further, I have instructed OLA to draft legislation amending 18 U.S.C. § 116 to enhance protections for children whose healthy body parts have been damaged by medical

---

[21] *See, e.g.*, Defs.' Mot., *Boe v. United States*, No. 2:22-cv-00184 (M.D. Ala. Jun. 26, 2024).

[22] Ala. Code § 26-26-1 (2022).

Memorandum for All Department Employees                                          Page 6
Subject:  Preventing the Mutilation of American Children

professionals practicing chemical and surgical mutilation.  I will also work with state legislatures to encourage the passage of similar legislation at the state level.

* * *

Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community.  Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care."  Under my leadership, the Department of Justice will bring these practices to an end.

# Exhibit 5



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*                    *Washington, DC 20044*

June 11, 2025

**MEMORANDUM**

TO:         All Civil Division Employees

FROM:     Brett A. Shumate         BRETT    Digitally signed by BRETT SHUMATE
           Assistant Attorney General   SHUMATE   Date: 2025.06.11 12:27:50 -04'00'

SUBJECT:   <u>Civil Division Enforcement Priorities</u>

President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives. This memorandum describes those policy objectives and directs Civil Division attorneys to prioritize investigations and enforcement actions advancing these priorities.

### 1.  Combating Discriminatory Practices and Policies

On January 21, 2025, President Trump issued Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), which established "the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* § 2.  To this end, the President "order[ed] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*  As part of these efforts, Attorney General Bondi has directed that the Department align its "litigating positions with [the] requirement of equal dignity and respect." Memorandum from Attorney General, *Eliminating Internal Discriminatory Practices*, at 2 (Feb. 5, 2025).

Consistent with these directives, the Civil Division will use all available resources to pursue affirmative litigation combatting unlawful discriminatory practices in the private sector. In particular, the Civil Division is authorized to bring suit under the False Claims Act for treble damages and penalties against any person who knowingly submits or causes the submission of false claims to the government. 31 U.S.C. § 3729 *et seq*.  This includes entities that receive federal funds but knowingly violate civil rights laws.  In support of these efforts, the Deputy Attorney General recently announced the Civil Rights Fraud Initiative.  The Civil Division is committed to advancing the Initiative and will aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws.  The Civil Division will work with the Civil Rights Division, relators, other whistleblowers, and federal agencies to advance these efforts.

### 2. Ending Antisemitism

On January 29, 2025, President Trump issued Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Feb. 3, 2025), which established the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold accountable the perpetrators of unlawful anti-Semitic harassment and violence," *id.* § 2, and encouraged the "Attorney General … to employ appropriate civil-rights enforcement authorities … to combat anti-Semitism," *id.* § 3(c). The Executive Order also reaffirmed Executive Order 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 16, 2019).

The Attorney General has established Joint Task Force October 7 ("JTF 10-7") and directed components to "prioritize seeking justice for victims of the October 7, 2023 terrorist attack in Israel" as well as "combatting antisemitic acts of terrorism and civil rights violations in the homeland." Memorandum from Attorney General, *Establishment of Joint Task Force October 7*, at 1 (Feb. 5, 2025). To assist these enforcement efforts, the Civil Division will prioritize investigations and enforcement actions against entities that make claims for federal funds but knowingly violate federal civil rights laws by participating in or allowing antisemitism.

### 3. Protecting Women and Children

The President has issued several Executive Orders protecting women and children. On January 20, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025), which established the "policy of the United States to recognize two sexes, male and female." *Id.* § 2. On February 3, President Trump issued Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025), which directed the Attorney General to, among other things, "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8(c).

Following these directives, Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, *Preventing the Mutilation of American Children*, at 3-4 (April 22, 2025). The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." *Id.* at 4.

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food,

Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.* In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

### 4. Ending Sanctuary Jurisdictions

On President Trump's first day in office, he issued multiple directives to secure the southern border. *See* Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). To ensure that States and local governments promote the enforcement of our nation's immigration laws, he also issued Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). This built on the President's previous Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (January 25, 2017). Moreover, Attorney General Bondi has directed the Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices," where appropriate. Memorandum from Attorney General, *Sanctuary Jurisdiction Directive*, at 3 (Feb. 5, 2025). Consistent with this directive, the Civil Division shall prioritize affirmative litigation to invalidate any State or local laws preempted by Federal law.

### 5. Prioritizing Denaturalization

The Department of Justice may institute civil proceedings to revoke a person's United States citizenship if an individual either "illegally procured" naturalization or procured naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The benefits of civil denaturalization include the government's ability to revoke the citizenship of individuals who engaged in the commission of war crimes, extrajudicial killings, or other serious human rights abuses; to remove naturalized criminals, gang members, or, indeed, any individuals convicted of crimes who pose an ongoing threat to the United States; and to prevent convicted terrorists from returning to U.S. soil or traveling internationally on a U.S. passport. At a fundamental level, it also supports the overall integrity of the naturalization program by ensuring that those who unlawfully procured citizenship, including those who obtained it through fraud or concealment of material information, do not maintain the benefits of the unlawful procurement.

The Civil Division shall prioritize and maximally pursue denaturalization proceedings in all cases permitted by law and supported by the evidence. To promote the pursuit of all viable denaturalization cases available under 8 U.S.C. § 1451 and maintain the integrity of the naturalization system while simultaneously ensuring an appropriate allocation of resources, the Civil Division has established the following categories of priorities for denaturalization cases:

1. Cases against individuals who pose a potential danger to national security, including those with a nexus to terrorism, espionage, or the unlawful export from the United States of sensitive goods, technology, or information raising national security concerns;

2. Cases against individuals who engaged in torture, war crimes, or other human rights violations;

3. Cases against individuals who further or furthered the unlawful enterprise of criminal gangs, transnational criminal organizations, and drug cartels;

4. Cases against individuals who committed felonies that were not disclosed during the naturalization process;

5. Cases against individuals who committed human trafficking, sex offenses, or violent crimes;

6. Cases against individuals who engaged in various forms of financial fraud against the United States (including Paycheck Protection Program ("PPP") loan fraud and Medicaid/Medicare fraud);

7. Cases against individuals who engaged in fraud against private individuals, funds, or corporations;

8. Cases against individuals who acquired naturalization through government corruption, fraud, or material misrepresentations, not otherwise addressed by another priority category;

9. Cases referred by a United States Attorney's Office or in connection with pending criminal charges, if those charges do not fit within one of the other priorities; and

10. Any other cases referred to the Civil Division that the Division determines to be sufficiently important to pursue.

These categories are intended to guide the Civil Division in prioritizing which cases to pursue; however, these categories do not limit the Civil Division from pursuing any particular case, nor are they listed in a particular order of importance. Further, the Civil Division retains the discretion to pursue cases outside of these categories as it determines appropriate. The assignment of denaturalization cases may be made across sections or units based on experience, subject-matter expertise, and the overall needs of the Civil Division.