———— FILED         ———— ENTERED
———— LODGED    ———— RECEIVED

SEP 2 6 2025  LS

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

# EXHIBIT 2

## TO DECLARATION OF ALLAN GORDUS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| v. | : | DATE FILED: _____ |
| ELI LILLY AND COMPANY | : | VIOLATION:<br>21 U.S.C. §§ 331(a), 333(a)(1) and |
| | : | 352(f)(1) (distribution of misbranded drugs: inadequate directions for use - 1 |
| | : | count)<br>Notice of forfeiture |

## INFORMATION

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

## BACKGROUND

1.      Defendant ELI LILLY AND COMPANY ("ELI LILLY") was a corporation operating and existing under the laws of the State of Indiana, with headquarters and manufacturing facilities located in Indianapolis, Indiana.  ELI LILLY was engaged in the development, manufacture, promotion, and sale of pharmaceutical drugs intended for human use. ELI LILLY distributed its pharmaceutical drugs throughout the United States.

2.      The Federal Food, Drug, and Cosmetic Act ("FDCA"), among other things, governed the interstate distribution of drugs for human use, as codified in 21 U.S.C. § 301, et seq.  The FDCA and its implementing regulations prohibited the distribution of any new drug in interstate commerce until the sponsor or manufacturer of that new drug had received

approval from the United States Food and Drug Administration ("FDA"), based on an intensive

application and review process. 21 U.S.C. § 355.

3.    The FDCA required that the sponsor of a new drug submit a New Drug

Application ("NDA") to the FDA, which identified all of the proposed uses of the drug intended

by that sponsor, together with the proposed labeling for those uses, and data, generated in

randomized and well-controlled clinical trials, that demonstrated to the FDA's satisfaction that

the drug would be safe and effective for those intended uses. 21 U.S.C. §§ 331(d) and 355(b).

4.    Until the FDA approved the NDA, including the proposed labeling, and

found sufficient evidence of the drug's safety and efficacy for the uses proposed by the sponsor,

the FDCA prohibited the sponsor from introducing the new drug into interstate commerce. 21

U.S.C. § 355(a). Only after the FDA approved the application was the sponsor permitted by law

to promote and market the drug, and then only for the medical conditions of use specified in the

approved labeling. Uses not approved by the FDA, and not included in the drug's approved label,

were known as "unapproved uses" or "off-label uses."

5.    Under the FDCA, if the sponsor of a drug wanted to market that drug for

an unapproved or off-label use, the sponsor first was required to submit to the FDA each

additional proposed use, together with evidence, in the form of randomized and well-controlled

clinical studies, sufficient to demonstrate that the drug was safe and effective for each additional

proposed therapeutic use. The sponsor could not label or promote the drug for any new intended

use without the prior approval of the FDA.

6.    The FDCA provided that a drug was misbranded if, among other things,

the labeling did not bear adequate directions for its use. 21 U.S.C. § 352(f)(1). Adequate

2

directions for use could not be written for medical indications or uses for which the drug had not been found by the FDA to have been proven to be safe and effective through well-controlled clinical studies. Drugs that were promoted for uses that had not been approved by the FDA were thus deemed misbranded as a matter of law under Section 352(f)(1).

7.      The FDCA prohibited the distribution in interstate commerce of a misbranded drug. 21 U.S.C. § 331(a) and (k).

## FDA APPROVAL AND REGULATORY ACTION

8.      On September 22, 1995, defendant ELI LILLY submitted an NDA seeking approval of a drug called Zyprexa (also known by the chemical name olanzapine) to treat schizophrenia and related disorders.

9.      On September 30, 1996, the FDA approved Zyprexa for the short-term management of the manifestations of psychotic disorders.

10.     On November 14, 1996, shortly after defendant ELI LILLY started to promote Zyprexa, the FDA sent ELI LILLY a letter informing the company that it found the company's promotional materials and activities "to be false or misleading, and in violation of the Federal Food, Drug, and Cosmetic Act." In particular, the FDA cautioned ELI LILLY about its marketing for elderly patients, advising the defendant that it was misleading to suggest that dosing of Zyprexa in the elderly was easy. In addition, the FDA cited false and misleading statements by an ELI LILLY officer, which characterized weight gain resulting from Zyprexa use as a therapeutic benefit, when in fact it was an adverse event noted in the approved labeling.

11.     In October 1998, defendant ELI LILLY submitted a supplemental new drug application for the use of Zyprexa to treat psychosis associated with Alzheimer's disease.

3

In August 1999, defendant ELI LILLY withdrew its supplemental new drug application for the use of Zyprexa to treat psychosis associated with Alzheimer's disease.

12.     Although defendant ELI LILLY submitted an application for use of an injectable form of Zyprexa to treat agitation associated with dementia, the FDA did not approve that use.

13.     Defendant ELI LILLY never submitted a supplemental new drug application for the use of Zyprexa to treat dementia or Alzheimer's dementia.

14.     The FDA never approved Zyprexa for the treatment of dementia, Alzheimer's dementia, psychosis associated with Alzheimer's disease, or the cognitive deficits associated with dementia.

15.     In March 2000, the FDA approved the addition of the subheading "schizophrenia" in the Indications and Usage section of the Zyprexa label to modify "the short-term management of the manifestations of psychotic disorders." Also in March 2000, the FDA approved Zyprexa for the short-term treatment of acute manic episodes associated with Bipolar I Disorder. In November 2000, the FDA approved new labeling for Zyprexa for the short-term treatment of schizophrenia in place of the management of the manifestations of psychotic disorders, and for maintaining treatment response in schizophrenic patients who had been stable for approximately eight weeks and were then followed for a period of up to eight months.

16.     On January 14, 2004, the FDA approved a label change for Zyprexa that added the following warning to the label, addressing the association of drugs such as Zyprexa (an atypical antipsychotic drug) with abnormalities in patients' glucose levels:

4

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hyperosmolar coma or death, has been reported in patients treated with atypical antipsychotics including olanzapine. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available.

17.    On February 16, 2006, the FDA approved a label change for Zyprexa that added a Black Box warning for increased mortality in elderly patients with dementia-related psychosis treated with atypical antipsychotics, including Zyprexa. The Black Box for Zyprexa stated:

Increased Mortality in Elderly Patients with Dementia-Related Psychosis — elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs are at an increased risk of death compared to placebo. Analyses of seventeen placebo-controlled trials (modal duration of 10 weeks) in these patients revealed a risk of death in the drug-treated patients of between 1.6 to 1.7 times that seen in placebo-treated patients. Over the course of a typical 10-week controlled trial, the rate of death in drug-treated patients was about 4.5%, compared to a rate of about 2.6% in the placebo group. Although the causes of death were varied, most of the deaths appeared to be either cardiovascular (e.g., heart failure, sudden death) or infectious (e.g., pneumonia) in nature. ZYPREXA (olanzapine) is not approved for the treatment of patients with dementia-related psychosis (see WARNINGS).

A Black Box warning was the highest level of warning that the FDA could require on a drug's label.

5

18.    On October 5, 2007, defendant ELI LILLY announced that it had updated the warnings section of the labeling for Zyprexa. The new changes included warnings for weight gain and hyperlipidemia (elevation of triglycerides and cholesterol), and updated information in the warning for hyperglycemia, including additional language on a greater association of increases in glucose levels with Zyprexa than with some other atypical antipsychotic medications. Specifically, the warning section of the label reads in part: "While relative risk estimates are inconsistent, the association between atypical antipsychotics and increases in glucose levels appears to fall on a continuum and olanzapine appears to have a greater association than some other atypical antipsychotics."

## ELI LILLY'S OFF-LABEL
## PROMOTION AND SALES PRACTICES

19.    From approximately September 1999 through at least November 2003, defendant ELI LILLY unlawfully promoted Zyprexa for the treatment of agitation, aggression, hostility, dementia, Alzheimer's dementia, depression, and generalized sleep disorder. These intended uses were not approved by the FDA. In promoting Zyprexa for these off-label uses, ELI LILLY caused the drug to be misbranded under 21 U.S.C. § 352(f)(1).

20.    Defendant ELI LILLY's management created marketing materials promoting Zyprexa for off-label uses, trained its sales force to disregard the law, and directed its sales personnel to promote Zyprexa for off-label uses.

21.    Beginning in 1999, defendant ELI LILLY expended significant resources to promote Zyprexa in nursing homes and assisted living facilities, primarily through ELI LILLY's long-term care sales force. ELI LILLY focused its efforts on long-term care facilities

6

and the elderly, even though schizophrenia rarely occurs in elderly patients. ELI LILLY sought

to convince doctors to prescribe Zyprexa to treat patients with disorders such as dementia,

Alzheimer's dementia, depression, anxiety, and sleep problems, and behavioral symptoms such

as agitation, aggression, and hostility, all of which are prevalent in the elderly population.

22.    Defendant ELI LILLY's long-term care sales representatives executed this

company plan, and promoted Zyprexa for the treatment of dementia, Alzheimer's dementia,

depression, anxiety, and sleep problems, and behavioral symptoms such as agitation, aggression,

and hostility.

23.    Defendant ELI LILLY promoted Zyprexa for the treatment of psychotic

and behavioral symptoms in patients with Alzheimer's dementia and for the treatment of

behavioral and psychological symptoms of dementia using medical reprints that purportedly

demonstrated Zyprexa's effectiveness in treating these diseases, even though ELI LILLY knew

that its studies of Zyprexa for the treatment of Alzheimer's psychosis had yielded mixed clinical

results, thus calling into question the effectiveness of Zyprexa for the treatment of this disease.

24.    In late 2001, defendant ELI LILLY's most senior management decided to

abandon ELI LILLY's efforts to obtain FDA approval for the use of Zyprexa for Alzheimer's

psychosis. ELI LILLY's management made that decision in part because the drug's use in that

disease produced mixed clinical results, a full clinical trial would be required, there were

concerns about Zyprexa's safety risks, and the FDA threshold for approval was high. ELI LILLY

never pursued FDA approval for Zyprexa for the treatment of dementia or Alzheimer's dementia.

25.    Building on its unlawful promotion and success in the long-term care

market, defendant ELI LILLY's executives decided to market Zyprexa to primary care

physicians. In October 2000, ELI LILLY began this off-label marketing campaign targeting primary care physicians, even though ELI LILLY knew that there was virtually no on-label use for Zyprexa in the primary care market.

26.    Defendant ELI LILLY trained its primary care physician sales representatives to promote Zyprexa by focusing on symptoms, rather than Zyprexa's FDA approved indications. ELI LILLY created patient profiles for the sales force to use to promote Zyprexa in this market, including a fictitious patient called "Martha," who had behavior difficulty and dementia with agitation. ELI LILLY trained its primary care physician sales representatives to lead with the "Martha" patient profile.

27.    Defendant ELI LILLY's primary care physician sales representatives promoted Zyprexa using the "Martha" patient profile, including Zyprexa's ability to treat the symptoms of dementia, such as agitation. "Martha" was a very successful tool for promoting and selling Zyprexa.

28.    Anticipating the possibility of resistance from primary care physicians in prescribing Zyprexa, defendant ELI LILLY specifically trained its sales representatives on how to respond to doctors' concerns about off-label uses of Zyprexa, and how to continue to promote Zyprexa for off-label indications.

29.    Defendant ELI LILLY retained medical professionals to speak to doctors during peer-to-peer sessions about off-label uses of Zyprexa, including depression, dementia and Alzheimer's dementia.

## HARM CAUSED BY ELI LILLY'S OFF-LABEL PROMOTION

30.    Defendant ELI LILLY's off-label promotion of Zyprexa raised safety issues, affected the treatment of patients, and undermined the FDA drug approval process. ELI LILLY undertook this illegal off-label promotion for its own financial gain, despite the potential risk to patients' health and lives.

31.    Defendant ELI LILLY knew that significant weight gain and obesity were adverse side effects of Zyprexa. ELI LILLY knew that significant weight gain and obesity were factors in causing hyperglycemia and diabetes.

32.    Despite the November 14, 1996 letter from the FDA, defendant ELI LILLY continued to promote adverse events as therapeutic benefits, particularly in elderly populations. For example, when promoting Zyprexa to health care providers for use in elderly populations, ELI LILLY's sales representatives stated that weight gain was a therapeutic benefit, not an adverse event of Zyprexa.

33.    In addition, when promoting Zyprexa to health care providers for use in elderly populations, defendant ELI LILLY's sales representatives informed health care providers that somnolence was a therapeutic benefit, not an adverse event of Zyprexa. ELI LILLY's sales representatives informed health care providers that 5 milligrams of Zyprexa at 5 P.M., referred to by the sales slogan "5 at 5," would help patients at night with sleep problems, behavioral issues, and dementia.

34.    More generally, the promotion of an off-label use for a prescription drug can interfere with the proper treatment of a patient. Off-label promotion can lull a physician into believing that the drug being promoted is safe and effective for the intended off-label use, and that the FDA has approved the drug for that use. Thus, off-label promotion can cause a doctor

9

and patient to forgo treatment with an FDA-approved drug that has been proven to be safe and effective, and instead to substitute a treatment urged by the sales representative that is not known to be safe and effective, and that may in fact be harmful.

## PROFIT TO ELI LILLY

35.     Defendant ELI LILLY profited by hundreds of millions of dollars by misbranding Zyprexa through off-label promotion, and distributing Zyprexa in interstate commerce.

36.     From in or about September 1999 through on or about March 31, 2001, in the Eastern District of Pennsylvania and elsewhere, defendant

### ELI LILLY AND COMPANY

introduced and caused the introduction into interstate commerce of quantities of Zyprexa, a drug within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(g), which was intended for use in treating dementia, including Alzheimer's dementia, and which drug was misbranded within the meaning of Title 21 United States Code, Section 352(f)(1), in that Zyprexa's labeling lacked adequate directions for such uses.

In violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1).

10

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.    As a result of the violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1) set forth in this information, defendant

### ELI LILLY AND COMPANY

shall forfeit to the United States of America any quantities of Zyprexa, which between September 1999 and March 31, 2001 were misbranded when introduced into or while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of Title 21, United States Code, Section 331, be introduced into interstate commerce.

2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $100,000,000.

11

All pursuant to Title 21, United States Code, Sections 334 and 853, and Title 28,

United States Code, Section 2461(c).


LAURIE MAGID
ACTING UNITED STATES ATTORNEY


EUGENE THIROLF
DIRECTOR
OFFICE OF CONSUMER LITIGATION
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

12

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA             :

       v.             :             **CRIMINAL NO.**

ELI LILLY AND COMPANY             :

## GUILTY PLEA AGREEMENT

Under Federal Rule of Criminal Procedure 11(c)(1)(C), the government, the defendant, Eli Lilly and Company (hereinafter "Eli Lilly"), and Eli Lilly's counsel enter into the following guilty plea agreement. Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania and the Office of Consumer Litigation of the Department of Justice.

      1.     Eli Lilly agrees to plead guilty to Count One of an Information, waiving prosecution by indictment, charging it with the introduction into interstate commerce of drugs that were misbranded, a misdemeanor, in violation of 21 U.S.C. §§ 331(a), 333(a)(1) and 352(f)(1), and not to contest forfeiture as set forth in the notice of forfeiture seeking forfeiture of $100,000,000 in substitute assets, in lieu of the drugs which were promoted illegally and are no longer available, all arising from Eli Lilly's illegal promotion of its drug Zyprexa in the United States between September 1999 and March 31, 2001. Eli Lilly further acknowledges its waiver of rights, as set forth in Exhibit A to this agreement.

      2.     The parties agree that this plea agreement is made pursuant to Fed.R.Crim.P. 11(c)(1)(C) and that the following specific sentence is the appropriate disposition

of this case. Taking into consideration the factors set forth in 18 U.S.C. §§ 3553(a) and 3572, the agreed upon sentence is as follows:

      A.    Eli Lilly agrees to pay the special assessment in the amount of $125 on the date of sentencing.

      B.    Eli Lilly agrees to pay $615,000,000 to resolve this Information, of which $515,000,000 will be applied as a criminal fine, and $100,000,000 will be applied as substitute assets to satisfy the forfeiture obligation described in paragraph 2(C) below. Eli Lilly will pay these amounts within 10 business days of the date of sentencing. Eli Lilly and the government agree that this fine and forfeiture represent a fair and just resolution of all issues associated with loss, fine and forfeiture calculations.

      C.    Eli Lilly agrees that as a result of its acts or omissions, the forfeitable property, that is the drugs which were promoted off-label, are no longer available for forfeiture as the drugs cannot be located or have been transferred, sold or deposited with a third party, or otherwise disposed of, within the meaning of federal law. As a result, Eli Lilly agrees to the entry and satisfaction of a judgment and preliminary order of forfeiture on the date of the guilty plea, forfeiting to the United States the sum of $100,000,000 as substitute assets for the pertinent drugs. Eli Lilly agrees that, within 10 business days of the date of sentencing, Eli Lilly will make payment to the United States, by means of a wire transfer to the United States Marshal Service or check payable to same, in the amount of $100,000,000, this amount representing substitute assets of the offense for which it is pleading guilty, subject to forfeiture in full satisfaction of the judgment and preliminary order of forfeiture.

2

D.    In light of the anticipated Corporate Integrity Agreement, Eli Lilly will not be placed on probation.

3.    Eli Lilly and the United States intend to execute a separate civil settlement agreement. Eli Lilly waives any and all defenses and objections in this matter or in that civil proceeding which might be available under the Double Jeopardy and Excessive Fines clauses of the Eighth Amendment. The parties agree that, in light of the separate civil settlement agreement, and to avoid unduly complicating and prolonging the sentencing process, the appropriate disposition of this case does not include a restitution order.

4.    Eli Lilly waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

5.    Eli Lilly understands, agrees and has had explained to it by counsel that the Court may impose the following statutory maximum sentence: a fine of $200,000, or twice the gross gain or gross loss, whichever is greater; a special assessment of $125; restitution as ordered by the Court; and a five-year term of Court supervision; in addition, forfeiture may be ordered. Eli Lilly further understands that the terms and conditions of any Court supervision may be changed, and extended, by the Court if Eli Lilly violates any of the terms and conditions of that supervision.

6.    With respect to Eli Lilly's conduct:

A.    The parties stipulate to the following facts and basis for the plea, criminal fine and forfeiture:

3

(1)     Eli Lilly marketed Zyprexa, which was a drug within the meaning of 21 U.S.C. § 321(g)(1).

(2)     Shipments of a drug in interstate commerce must be accompanied by labeling bearing adequate directions for use for each of the drug's intended uses.

(3)     In September 1996, Zyprexa was approved by FDA for the short term management of the manifestations of psychotic disorders.  In March 2000, FDA approved the addition of the subheading "schizophrenia" to the short term management of the manifestations of psychotic disorders.  Also in March 2000, FDA approved Zyprexa for the short-term treatment of acute manic episodes associated with Bipolar I Disorder.  In November 2000, FDA approved new labeling for Zyprexa for the short term treatment of schizophrenia in place of the management of the manifestations of psychotic disorders.  Also in November 2000, FDA approved Zyprexa for maintaining treatment response in schizophrenic patients who had been stable for approximately eight weeks and were then followed for a period of up to eight months.

(4)     Between September 1999 and March 31, 2001, Eli Lilly promoted Zyprexa in elderly populations as treatment for

4

dementia, including Alzheimer's dementia. Zyprexa is not approved by the FDA for treatment of dementia or Alzheimer's dementia. Eli Lilly's promotion of Zyprexa for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Zyprexa's labeling did not bear adequate directions for each of the drug's intended uses.

B.     The United States contends that, as a matter of relevant conduct, the conduct which forms the basis for this plea agreement, as set forth in subsection (A) above, continued past March 31, 2001. Eli Lilly does not admit that this conduct extended past March 31, 2001.

7.     Eli Lilly and the United States retain the right to withdraw from this guilty plea agreement, and this plea agreement will be null and void, if the civil settlement agreement and Corporate Integrity Agreement are not executed prior to the filing of the Information.

8.     Except as provided herein, the United States agrees that, other than the charges in the Information in this case, it will not bring any other criminal charges against Eli Lilly, its present and former parents, affiliates, divisions, and subsidiaries; their predecessors, successors and assigns for conduct which (A) falls within the scope of the criminal investigation in the Eastern District of Pennsylvania relating to Eli Lilly's drug Zyprexa; or (B) was known to the United States Attorney's Office for the Eastern District of Pennsylvania or the Office of Consumer Litigation of the Department of Justice as of the date of the execution of this plea agreement, and which concerned the sale, promotion, or marketing of Zyprexa in the United

States. The non-prosecution provisions of this paragraph are binding on the Office of the United States Attorney for the Eastern District of Pennsylvania, the Office of Consumer Litigation of the Department of Justice, and the United States Attorney's Offices for each of the other 93 judicial districts of the United States. The non-prosecution provisions are also binding on the Criminal Division of the United States Department of Justice, except that the investigation of Eli Lilly and its affiliates, divisions, and subsidiaries, being conducted by the Fraud Section of the Criminal Division regarding possible violations of the Foreign Corrupt Practices Act and related offenses in connection with the sales and marketing of Eli Lilly's products to foreign customers is specifically excluded from the non-prosecution provisions and release provided by this paragraph and agreement. Attached as Exhibit B is a copy of the letter to Acting United States Attorney Laurie Magid from the Assistant Attorney General, Criminal Division, Department of Justice, authorizing this agreement.

   9.  Eli Lilly understands that this guilty plea agreement does not bind any other government agency, or any component of the Department of Justice except as specified in paragraph 8 of this guilty plea agreement. Further, Eli Lilly understands that the United States takes no position as to the proper tax treatment of any of the payments made by Eli Lilly pursuant to this plea agreement, the civil settlement agreement, or the Corporate Integrity Agreement referenced in this plea agreement.

   10.  Eli Lilly agrees to waive the statute of limitations, and any other time-related defense, to the charge to which it is agreeing to plead guilty under this plea agreement, provided that the guilty plea is accepted by the Court.

11.    Eli Lilly understands and agrees that, should it withdraw its plea or if Eli Lilly's guilty plea is not accepted by the Court for whatever reason, Eli Lilly may thereafter be prosecuted for any criminal violation of which the United States has knowledge arising out of this investigation, notwithstanding the expiration of any applicable statute of limitations between the time period when Eli Lilly signed this plea agreement and either Eli Lilly's withdrawal of its plea or the Court's rejection of its plea.  In that event, Eli Lilly agrees that it will not raise the expiration of any statute of limitations as a defense to any such prosecution, except to the extent that the statute of limitations would have been a defense pursuant to the terms of a Tolling Agreement between the parties effective October 7, 2008, all subsequent extensions of the Tolling Agreement, and this paragraph.

12.    In exchange for the undertakings made by the government in entering this plea agreement, Eli Lilly voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.  This waiver is not intended to bar the assertion of constitutional claims that the relevant case law holds cannot be waived.

13.    Eli Lilly also waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

14.     Eli Lilly is satisfied with the legal representation provided by its lawyers; Eli Lilly and its lawyers have fully discussed this guilty plea agreement; and Eli Lilly is agreeing to plead guilty because Eli Lilly admits that it is guilty of the misdemeanor described in paragraph 1.

15.     Eli Lilly will acknowledge acceptance of this guilty plea agreement by the signature of its counsel and of an authorized corporate officer.  Eli Lilly shall provide to the government for attachment as Exhibit C to this plea agreement a notarized resolution by Eli Lilly's Board of Directors authorizing the corporation to enter a plea of guilty, and authorizing a corporate officer to execute this agreement.

16.     If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure, and ask that Eli Lilly be sentenced at the time the guilty plea is entered.

17.     It is agreed that the parties' guilty plea agreement contains no additional promises, agreements or understandings other than those set forth in this written guilty plea agreement, and that no additional promises, agreements or understandings will be entered into unless in writing and signed by all parties.

## SIGNATURES FOR THE UNITED STATES

GREGORY G. KATSAS
Assistant Attorney General
Civil Division
United States Department of Justice


EUGENE M. THIROLF
Director, Office of Consumer Litigation
United States Department of Justice


LAURIE MAGID
Acting United States Attorney


JEFFREY I. STEIGER
Trial Attorney
Office of Consumer Litigation
United States Department of Justice


LINDA DALE HOFFA
Chief, Criminal Division
Assistant United States Attorney


ROSS S. GOLDSTEIN
Trial Attorney
Office of Consumer Litigation
United States Department of Justice


CATHERINE VOTAW
Assistant United States Attorney


MARILYN S. MAY
Assistant United States Attorney


DATE: 1-14-09


DENISE S. WOLF
Assistant United States Attorney

9

SIGNATURE FOR ELI LILLY

DATE: _14 Jan. 2009_

ROBERT A. ARMITAGE
Senior Vice President and General Counsel
Eli Lilly and Company

SIGNATURES OF ELI LILLY'S ATTORNEYS

DATE: _1/14/09_

NINA M. GUSSACK
Pepper Hamilton LLP
Counsel for Defendant

DATE: _1/14/09_

THOMAS M. GALLAGHER
Pepper Hamilton LLP
Counsel for Defendant

DATE: _1/14/09_

PAUL E. KALB
Sidley Austin LLP
Counsel for Defendant

DATE: _1/14/09_

BRADFORD A. BERENSON
Sidley Austin LLP
Counsel for Defendant

10

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

          v.                 :          CRIMINAL NO.

ELI LILLY AND COMPANY              :

## ACKNOWLEDGMENT OF RIGHTS

Eli Lilly and Company ("Eli Lilly"), through its properly authorized officer, hereby acknowledges that it has certain rights that it will be giving up by pleading guilty.

1. Eli Lilly understands that it does not have to plead guilty.

2. Eli Lilly may plead not guilty and insist upon a trial.

3. At that trial, Eli Lilly understands:

    a. that Eli Lilly would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with its attorney, Eli Lilly would have the right to participate in the selection of that jury;

    b. that the jury could only convict Eli Lilly if all twelve jurors agreed that they were convinced of Eli Lilly's guilt beyond a reasonable doubt;

    c. that the government would have the burden of proving Eli Lilly's guilt beyond a reasonable doubt and that Eli Lilly would not have to prove anything;

    d. that Eli Lilly would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that Eli Lilly was guilty;

    e. that Eli Lilly would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if Eli Lilly could not afford to hire a lawyer, the court would appoint one for Eli Lilly free of charge;

    f. that through Eli Lilly's lawyer Eli Lilly would have the right to confront and cross-examine the witnesses against Eli Lilly;

g.    that Eli Lilly could call witnesses to testify in its defense if Eli Lilly wanted to, and Eli Lilly could subpoena witnesses for this purpose if Eli Lilly wanted to; and

h.    that Eli Lilly would not have to call witnesses to testify or otherwise present any defense if Eli Lilly did not want to, and that if Eli Lilly did not present any evidence, the jury could not hold that against Eli Lilly.

4.    Eli Lilly understands that if Eli Lilly pleaded guilty, there will be no trial and Eli Lilly would be giving up all of the rights listed above, as well as any other rights associated with the trial process arising under statute, common-law, or judicial precedent.

5.    Eli Lilly understands that if Eli Lilly decides to enter a plea of guilty, the judge will ask Eli Lilly representatives questions under oath, and that if any of those representatives lie on behalf of Eli Lilly in answering those questions, those persons could be prosecuted for the crime of perjury, that is, for lying under oath.

6.    Eli Lilly understands that if Eli Lilly pleads guilty, Eli Lilly has waived its right to appeal, except as set forth in appellate waiver provisions of the plea agreement.

7.    Understanding that Eli Lilly has all these rights and that by pleading guilty Eli Lilly is giving them up, Eli Lilly still wishes to plead guilty.


ROBERT A. ARMITAGE
Senior Vice President and General Counsel
Eli Lilly and Company


PAUL E. KALB
Sidley Austin LLP
Counsel for Defendant

DC1 1305333v.1

2

**Exhibit B**



**U.S. Department of Justice**

Criminal Division

---

*Acting Assistant Attorney General*                    *Washington, D.C. 20530*

JAN  9 2009

The Honorable Laurie Magid
Acting United States Attorney
Eastern District of Pennsylvania
Philadelphia, Pennsylvania 19106

Attention:    Catherine Votaw
              Assistant United States Attorney

Re:    <u>Global Non-prosecution Agreement for Eli Lilly and Company</u>

Dear Ms. Magid:

    This is in response to your request for authorization to enter into a global case disposition agreement with the business entity known as Eli Lilly and Company.

    I hereby approve the terms of the Plea Agreement, including Paragraph 8, in which the United States Attorney's Offices and the Criminal Division of the Department of Justice agree not to initiate further criminal prosecutions as set out therein.

    You are authorized to make this approval a matter of record in this proceeding.

                            Sincerely,

                            Matthew W. Friedrich
                            Acting Assistant Attorney General

                            John C. Keeney
                            Deputy Assistant Attorney General
                            Criminal Division

**Exhibit C**

### CERTIFICATE OF SECRETARY
### ELI LILLY AND COMPANY

I, James B. Lootens, certify that I am Secretary of Eli Lilly and Company, an Indiana Corporation (the "Company"), and that I am authorized to give this Certificate on behalf of the Company.

I further certify that the resolutions set forth below were adopted by the Board of Directors of the Company at a meeting duly held on January 14, 2009, and that such resolutions remain in full force and effect as the date of this certificate.

WHEREAS, Eli Lilly and Company has found that it is in the best interest of the company to enter into proposed federal and related state settlements regarding Zyprexa, including entering into:

(1) a plea agreement with the United States Attorney's Office for the Eastern District of Pennsylvania and the Office of Consumer Litigation to plead guilty to a single misdemeanor count of violation of the Federal Food, Drug, & Cosmetic Act ("FDCA") substantially in the form presented to the meeting, initialed by the secretary, and ordered to be filed with the records of the meeting as Attachment 1;

(2) civil settlement agreements with the federal government and the coordinating states;

(3) a Corporate Integrity Agreement with the HHS Office of Inspector General substantially in the form presented to the meeting, initialed by the secretary, and ordered filed with the records of the meeting as Attachment 2; and

(4) all other documents necessary to effectuate the settlement;

it is

RESOLVED, That the company, having been counseled on the company's legal rights and the factual basis for the plea as set forth in Federal Rule of Criminal Procedure 11(b), does hereby authorize to cause its General Counsel, Mr. Robert A. Armitage, and such of its outside counsel as Mr. Armitage shall designate, to enter into and execute a plea agreement substantially in the form of Attachment 1 and the other settlement documents referenced above.

2

RESOLVED, FURTHER, That any and all agreements executed on behalf of the company in connection with the transactions contemplated, and all further actions necessary to complete and effectuate those transactions, including the personal appearance in court to enter a plea of guilty on behalf of the company by a corporate officer of at least the level of vice president as designated by Mr. Armitage, hereby are ratified and approved.

This certificate is executed on January 14, 2009.

James B. Lootens
Secretary

UNITED STATES OF AMERICA

STATE OF INDIANA        )
                        ) SS
COUNTY OF MARION        )

Before me, a Notary Public for Marion County, State of Indiana, personally appeared James B. Lootens and acknowledged the execution of the foregoing instrument this 14th day of January, 2009.

NOTARY PUBLIC
*Marie A. Thomas*
*My Commission Expires*
*February 10, 2009*
*Resident of Marion County*



(SEAL)

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **Criminal No.** |
| ) | |
| ) | **21 U.S.C. §§ 331(a), 333(a)(2)** |
| v. ) | **and 352 (Introduction into** |
| **PHARMACIA & UPJOHN COMPANY, INC.** ) | **Interstate Commerce of a** |
| Defendant. ) | **Misbranded Drug)** |

## 09 CR 10258 DPW

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

1.   **PHARMACIA & UPJOHN COMPANY, INC.** (hereinafter "**PHARMACIA INC.**") was a Delaware corporation with a principal place of business in Kalamazoo, Michigan. **PHARMACIA INC.** was a wholly owned subsidiary of Pharmacia & Upjohn LLC, the successor to Pharmacia & Upjohn Company, which was a successor of Pharmacia Corporation, all of which were acquired in April 2003 by Pfizer Inc (all of these entities and their subsidiaries hereinafter collectively "**PHARMACIA**"). During the relevant time frame, **PHARMACIA** developed, manufactured, distributed and sold pharmaceutical products nationwide and in the District of Massachusetts.

2.   Prior to the April 2003 acquisition, Pharmacia Corporation and its subsidiaries, including **PHARMACIA INC.**, jointly promoted the drug Bextra with Pfizer Inc. Since April 2003, Pharmacia Corporation and Pharmacia Inc. have been wholly owned subsidiaries of Pfizer Inc.

3.      **PHARMACIA INC.** holds the United States trademarks and patents for the drug

Bextra, which was distributed from Puerto Rico into interstate commerce throughout the United

States, including specifically into Massachusetts, from in or about February 2002 until

approximately April 2005.

### The FDA and the FDCA

4.      The United States Food and Drug Administration ("FDA") was the federal agency

of the United States responsible for protecting the health and safety of the public by enforcing the

Federal Food, Drug and Cosmetic Act, ("FDCA"), 21 United States Code, Section 301, *et seq.*,

and ensuring, among other things, that drugs intended for use in humans were safe and effective

for each of their intended uses and that the labeling of such drugs bore true and accurate

information.

5.      The FDCA, and its implementing regulations, required that, with certain

exceptions not relevant here, before a new drug could legally be introduced into interstate

commerce, a sponsor of a new drug submit and obtain approval of a New Drug Application

("NDA") from the FDA.

6.      The FDCA required that the NDA include proposed labeling for the proposed

intended uses of the drug which included, among other things, the conditions for therapeutic use.

The NDA was also required to contain, to the satisfaction of FDA, data generated in adequate

and well-controlled clinical trials that demonstrated that the drug would be safe and effective

when used in accordance with the proposed labeling.

7.      An NDA sponsor was not permitted to promote and market a new drug until it had

an approved NDA, including approval for the proposed labeling. Moreover, if approved, the

2

sponsor was permitted to promote and market the drug only for the medical conditions of use and

dosages specified in the approved labeling. Uses not approved by the FDA, including dosages

not approved in the drug's approved labeling, were known as "unapproved" or "off-label" uses.

8.    The FDCA, and its implementing regulations, required the sponsor to file a

Supplemental NDA ("sNDA"), in order to label or promote a drug for uses and dosages different

from the conditions for use and dosage specified in the approved labeling. The sNDA was

required to include a description of the newly proposed indications for use, and evidence

consisting of well-controlled clinical studies, sufficient to demonstrate that the drug was safe and

effective for the new use or uses. Only upon FDA approval of the sNDA could the sponsor

promote the drug for the new intended use.

9.    The FDCA provided that, unless otherwise exempted, a drug was misbranded if,

among other things, the labeling did not contain adequate directions for use. 21 U.S.C.

§ 352(f)(1). Adequate directions for use could not be written for medical indications or uses for

which the drug had not been approved and proven to be safe and effective through well-

controlled clinical studies because unapproved uses could not be included in the labeling.

Drugs that were promoted for uses that had not been approved by the FDA were deemed to be

misbranded under Section 352(f)(1).

10.    The FDCA prohibited the delivery for introduction and causing the delivery for

introduction into interstate commerce of a misbranded drug.

## The Bextra Approval Process

11.    Bextra was **PHARMACIA's** trade name for the drug valdecoxib that was a so-

called "Cox-2 Inhibitor." At the time Bextra first came on the market in February 2002, the

3

"Cox-2" class of drugs included the previously released drug Celebrex, also marketed by

**PHARMACIA**, and Vioxx, manufactured and marketed by a competitor.

12.     The Cox-2 class of drugs was designed to relieve various forms of pain and

inflammation and was intended to offer pain relief equal to the predecessor pain relievers, but

without the negative gastrointestinal side effects often associated with those drugs.  Thus, for

many patients, the justification for switching to a Cox-2 drug over the other available pain

relievers was greater gastrointestinal safety, not better efficacy.

13.     Because many of the other pain relievers, such as ibuprofen or naproxen, were

available as generic and over-the-counter drugs at the time Bextra was launched, Bextra was

much more expensive than the competitor drugs.

14.     On or about January 15, 2001, **PHARMACIA** submitted an NDA seeking

approval of Bextra, which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21

C.F.R. §§ 310.3 (h)(4) and (5).  In that NDA, **PHARMACIA** sought approval to market Bextra

at dosages of 10 mg, 20 mg and 40 mg for the following uses:

> (1)     For the prevention and treatment of acute pain in adults.  Preoperative
> administration of [Bextra] prevents or reduces post-operative pain.
> [Bextra] has an opioid sparing effect when used concomitantly with
> opioids;
>
> (2)     For the treatment of primary dysmenorrhea; and
>
> (3)     For relief of signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

### The FDA Approval and Non-Approval of Bextra

15.     On or about November 16, 2001, the FDA approved Bextra to treat the signs and

symptoms of osteoarthritis ("OA"), adult rheumatoid arthritis ("RA") and for the treatment of

primary dysmenorrhea ("PD").  **PHARMACIA** sought approval of Bextra for general acute pain,

4

for the preemption of the pain of surgery, and for opioid sparing, but the FDA declined to grant such approvals.

16.     Moreover, although **PHARMACIA** had sought approval for the 10 mg, 20 mg and 40 mg doses for all uses, the FDA only approved the 20 mg dose twice a day as needed for PD, and the FDA only approved the 10 mg dose once a day for OA and RA (hereinafter these uses for Bextra will be referred to throughout this Information as the "Approved Uses and Dosages").

17.     The FDA never approved Bextra for any use or dosage other than the Approved Uses and Dosages.

18.     The FDA informed **PHARMACIA** that it was not approving Bextra for acute pain at least in part because of a safety concern about Bextra.   The safety concern cited by the FDA was the results of a study of Bextra following the administration of its injectable form, parecoxib, used in patients undergoing coronary artery bypass graft surgery (the "CABG I" trial), in which the FDA noted that there was an excess of serious cardiovascular thromboembolic events in the Bextra (after parecoxib) arm of the trial.

19.     In its comments to the proposed label for Bextra, the FDA also informed **PHARMACIA** that the FDA recommended against the use of 20 mg for treatment of arthritis based upon an increased potential for adverse events at higher dosages.

20.     In or about October 2004, the results of a second study of Bextra and parecoxib in coronary artery bypass graft surgery ("CABG II") became public.  This study showed a statistically significant increase in thromboembolic cardiovascular events in CABG patients taking Bextra following the administration of parecoxib.

21.    As a result of this study, in or about November 2004, a warning was added to Bextra's product label which stated that Bextra was contraindicated for treatment of post-operative pain following CABG surgery.  At the same time, the FDA required a black box warning on Bextra's label about reports of serious skin reactions, including Stevens-Johnson syndrome, in patients receiving Bextra.

22.    From in or about February 2002 through April 2005, **PHARMACIA** promoted the sale of Bextra, as set forth below, for uses and dosages other than the Approved Uses and Dosages and/or with false and misleading claims of safety and efficacy and without disclosing the FDA's safety concerns.

**A.    PHARMACIA's Promotion of Bextra for General Acute Pain**

23.    **PHARMACIA** marketed Bextra for acute pain, including surgical pain, and at unapproved doses, despite the FDA's specific refusal to approve Bextra for those uses, and without disclosing to physicians, customers and others that the FDA specifically declined to approve Bextra for those uses and doses, and that the FDA's refusal was due in part to a safety concern about potential serious adverse events including cardiovascular events in some surgeries based upon the results of the CABG I study.

24.    From in or about November 2001 to in or about April 2005, **PHARMACIA's** marketing team positioned Bextra for *acute* pain to differentiate Bextra's use from that of **PHARMACIA's** existing drug Celebrex, which was often used for *chronic* conditions, and to take sales from its competitor's drug Vioxx, which was used by many physicians for acute pain, among other indications.  In doing so, **PHARMACIA** sought to maximize Bextra sales while avoiding cannibalizing sales of **PHARMACIA's** existing Cox-2 drug, Celebrex.

25.    **PHARMACIA's** headquarters marketing team created marketing messages and materials for the **PHARMACIA** sales force that promoted Bextra for unapproved uses and dosages, including materials that directed **PHARMACIA's** sales force to aggressively pursue written surgical and pain management standing orders for Bextra, including for uses for which Bextra was unapproved.

26.    From in or about October 2002 to January 2003, and at other times, **PHARMACIA** marketing managers commissioned market research to test new promotional visual aids for Bextra to determine, among other things, whether the visual aids delivered the "intended message" of Bextra for "acute pain."

27.    For example, on or about December 5, 2002, a **PHARMACIA** marketing manager for Bextra forwarded to senior **PHARMACIA** marketing managers a market research report that concluded that "almost all physicians clearly understood the intended use of Celebrex (for chronic pain) and Bextra (for acute pain)" and noted in the cover email that the visual aid clearly communicated the "intended message" that "Celebrex is for chronic pain; Bextra is for acute or tough to treat pain."

28.    On or about March 24, 2003 and thereafter, **PHARMACIA** continued to promote Bextra for such unapproved uses and dosages despite the fact that a senior **PHARMACIA** manager of market analytics notified marketing managers that "the majority" of **PHARMACIA** sales representatives surveyed were using a "chronic/acute" or "persistent/acute" distinction to describe how the physician can use Celebrex and Bextra and noted that some of the representatives surveyed voiced "discomfort" in delivering this positioning of Celebrex for chronic and Bextra for acute pain, in light of the fact that Bextra had no acute pain indication.

7

29.    In or about March 2003, **PHARMACIA** marketing managers, in a presentation to other **PHARMACIA** marketing managers, highlighted as a success factor the fact that **PHARMACIA** had promoted Bextra for acute pain and Celebrex for chronic pain and set forth as an opportunity for improvement the "Need to Emphasize Chronic Use of Celebrex, Acute use of Bextra."

30.    In or about August 2003, **PHARMACIA** commissioned a market research report to confirm that a visual aid it was preparing for sales representatives to promote Celebrex and Bextra.  The report confirmed that the visual aid conveyed the message to physicians that **PHARMACIA** intended Bextra to be used for acute pain, and concluded that "[a]fter seeing the positioning statement for Bextra, virtually all physicians concluded that **PHARMACIA** was trying to differentiate Bextra as a product for acute pain."

31.    In or about September 2003, **PHARMACIA** again commissioned market research to be performed to confirm that the final version of the new visual aid conveyed **PHARMACIA's** intended message for the use of Bextra.  The report stated:

> More so than in other research conducted by this moderator for this team to date, physicians are starting to extract a "chronic/long-term" message for Celebrex and an "acute" message for Bextra from the visual aid materials, which will likely become more apparent over time through continued exposure to the new visual aid.

32.    **PHARMACIA** continued to promote Bextra for such unapproved uses and dosages  even after senior marketing managers received this market research and internal reports that indicated that the sales force was promoting Bextra for unapproved uses and dosages.

B.     **PHARMACIA's Promotion of Bextra for Unapproved Uses Through Remuneration to Physicians and Purported Physician Consulting Arrangements**

33.     **PHARMACIA** also promoted Bextra for unapproved use and dosages by convening so-called advisory boards, consultant meetings and other fora. **PHARMACIA** targeted physicians to participate in these meetings, as part of what **PHARMACIA** termed a "cascade of influence" in order to turn high prescribing physicians into **PHARMACIA** Cox-2 "advocates."

34.     As part of this process, **PHARMACIA** conducted what it terms "Influence Mapping" in which it conducted market research to identify "influential specialists in the areas of arthritis and pain" and to provide an "Advocate Concierge" or a "High level service to aid key Advocates in managing their interaction" with **PHARMACIA**. As part of this process, **PHARMACIA** ranked key physicians in terms of their ability to influence key professional societies, regulatory agencies, guideline committees, and specialty journals.

35.     For example, **PHARMACIA's** 2002 planning documents described the 2002 activities that it planned to use to disseminate its Bextra messages, including National Advisory Boards, National Steering Committee Meetings, National Consultant Meetings and Regional Consultant Meetings, all in order to "Deliver Product Messages with Data Support for Both Brands" and "Maximize Cost Synergies & ROI [Return on Investment]."

36.     As part of this process, **PHARMACIA** paid targeted physicians both airfare and two to three days' accommodations at lavish resorts in the Bahamas, Virgin Islands and across the United States, and further entertained these physicians with golf, massages and other recreational activities, and also paid them an honoraria in the range of $1,000 to $2,000 for their

9

attendance. The number of attendees at this event often ranged from 50 to 100 health care professionals.

37.    Between late 2001 and late 2003, **PHARMACIA** held almost 100 of these so-called consultant meetings and thus promoted unapproved uses and dosages of Bextra to and entertained over 5,000 health care professionals.

38.    In furtherance of these plans, **PHARMACIA** paid these physicians whom it had identified as these advocates to present at lunches, dinners, and other entertainment venues, where in many instances **PHARMACIA** thereby further spread its messages about unapproved uses and dosages of Bextra.

C.    <u>**PHARMACIA's Promotion of Bextra for Surgical Pain**</u>

39.    **PHARMACIA** managers instructed their sales teams to promote Bextra for the acute pain of surgery, both pre- and post-operatively, even though they knew that Bextra was not FDA- approved for these uses, and without disclosing to physicians, customers and others that the FDA specifically declined to approve Bextra for those uses and doses, and that the FDA's refusal was due in part to a safety concern about potential serious adverse events, including cardiovascular events, in some surgeries based upon the results of the CABG I study.

40.    **PHARMACIA** managers trained and directed their sales teams to seek written surgical and pain management protocols, standing orders and pathways from physicians, hospitals. and other customers for use in pre- and post-operative surgical situations.

41.    **PHARMACIA** managers circulated an electronic template of a hospital-wide pain management pathway that provided for administration of Bextra for unapproved uses and at unapproved dosages and gave instructions on how to get such pathways printed on laminated

10

color paper and distributed in hospitals and other institutions.

42.     **PHARMACIA** managers encouraged their sales representatives to promote

Bextra for unapproved uses and dosages by circulating examples of written protocols obtained by

other representatives that called for unapproved uses and dosages of Bextra in certain surgical

and pain management settings.

43.     **PHARMACIA** managers held contests to encourage the preparation and

promotion of such protocols and praised and rewarded representatives who obtained such

surgical and pain management protocols for unapproved uses and dosages of Bextra.

44.     Consistent with these instructions and incentives, **PHARMACIA's** sales team

promoted, drafted and distributed to physicians written protocols, pain management pathways

and standing orders for Bextra for uses and dosages that they knew were not FDA-approved.

45.     For example, in or about June or July 2002, a **PHARMACIA** sales representative

in Massachusetts drafted and recommended a written protocol to an OB/GYN physician in

Massachusetts calling for the unapproved use of Bextra to control pain in OB/GYN surgeries,

including at unapproved dosages.

46.     On or about July 19, 2002, a **PHARMACIA** Regional Manager sent an email to

sales representatives in the Northeast region praising the sales representative for a "fantastic

protocol" in six areas of OB/GYN surgery, each an unapproved use for Bextra.

47.     On or about February 19, 2003, a **PHARMACIA** District Manager sent an email

to the sales representatives in the district, with a copy to a Regional Manager that instructed the

representatives to sell Bextra for pre- and post-operative pain to orthopedic surgeons, podiatrists,

oral surgeons, and "anyone that uses a scalpel for a living."

11

48.     On or about June 19, 2003, a **PHARMACIA** District Manager emailed a sample pre-operative briefing sheet to sales representatives to use, with a copy to the Regional Manager, which provided for the use of 10 mg and 20 mg of Bextra once or twice a day as part of the pre-operative surgery instructions, without any limit to Bextra's Approved Uses or Dosages.

49.     In the June 19, 2003 email, a **PHARMACIA** District Manager praised the efforts of the sales representative who drafted, promoted and persuaded a physician to adopt the above briefing sheet and awarded the representative "ACE" points, which are points that could be used to select prizes such as trips, gift certificates and appliances from a **PHARMACIA** awards catalog.

50.     On or about July 25, 2003, a **PHARMACIA** District Manager circulated to the Regional Manager in his district and district managers in other districts an "OPERATE FOR CASH" contest, in which sales representatives could earn ACE points by implementing Bextra written standing orders and protocols with individual orthopedic surgeons, hospital-wide, or in surgical departments.

51.     On or about August 26, 2003, a **PHARMACIA** District Manager sent an email, with a copy to the Regional Manager, that instructed sales representatives to promote Bextra and Celebrex for pre- and post-operative pain, reminded them about the Operate for Cash contest, and suggested the representatives focus on "low hanging fruit," such as oral surgeons, periodontists and dentists, none of whom would have an FDA-approved use for Bextra.

**D.**    **PHARMACIA's Off-Label Promotion of Bextra for Prevention of Deep Vein Thrombosis ("DVTs")**

52.    **PHARMACIA** caused members of its sales force to promote Bextra with the claim that Bextra was effective in the surgical setting to reduce the risk of blood clots known as DVTs that can form during or after surgery. In promoting Bextra to reduce the risk of DVTs, **PHARMACIA** representatives did not disclose that the FDA specifically refused to approve Bextra for the treatment of pre- and post-operative surgical pain, and that the FDA had concluded that the safety and efficacy of Bextra for such use had not been established, including specifically that a reduction of side effects (such as DVT's) had not been shown in the studies. As **PHARMACIA** knew, there were no scientific studies showing that Bextra was safe or effective to reduce the risk of DVTs.

53.    Thus, on or about April 24, 2002, a **PHARMACIA** Regional Manager sent an email to sales representatives and managers in the division, including numerous representatives and managers, and instructed them (with an attached script) to promote the use of Bextra to reduce the risk of DVTs to surgeons, even though the Regional Manager knew that Bextra had not been approved by the FDA to reduce the risk of DVTs.

54.    In at least one region, **PHARMACIA** sales representatives and managers implemented this instruction and promoted Bextra to physicians to reduce the risk of DVTs during and after surgery, without disclosing to these physicians the safety concern that the FDA has raised concerning the use of Bextra in surgery, or the fact that the FDA had concluded that no decrease in the side effects of surgery such as DVTs had been shown from the use of Bextra.

**E.    PHARMACIA's Promotion of Bextra with False and Misleading Safety and Comparative Claims**

55.    **PHARMACIA** sales representatives promoted Bextra by telling physicians to replace Vioxx with Bextra even though Vioxx had an FDA-approved acute pain indication and Bextra did not; and by telling physicians that Bextra was safer and more effective than Vioxx, despite the fact that **PHARMACIA** knew there were no head-to-head studies of Bextra and Vioxx for the approved uses of Bextra that showed that Bextra was safer or more effective.

56.    **PHARMACIA** sales representatives promoted Bextra with false and misleading claims of safety, including that Bextra had no dose proportional increase in hypertension and edema, that "there is not one shred of evidence showing a CV concern with Bextra," that Bextra had no cardiovascular risks unlike Vioxx, and that Bextra had placebo-like side effects.

57.    For example, on or about January 16, 2004, a **PHARMACIA** Regional Manager circulated to other **PHARMACIA** managers in the Northeast a Product Action Guide that listed as core messages for the promotion of Bextra that "Vioxx's problems are not a class effect. [ . . . With] Bextra there is no dose proportional response with hypertension and edema."

58.    **PHARMACIA** sales representatives implemented this instruction and promoted Bextra to physicians with the claims that "Vioxx' problems are not a class effect" and "there is no dose proportional response with hypertension and edema" with Bextra, even though these claims were not proven nor supported by Bextra's label. In fact, the evidence in Bextra's label demonstrates that it does cause a dose proportional increase of hypertension and edema.

14

F.    **PHARMACIA's Promotion of Bextra Through Falsely Claiming that Physicians Had Asked for Information About Unapproved Uses**

59.    **PHARMACIA's** sales representatives also created sham physician requests for medical information about unapproved uses in order to send unsolicited information to physicians about unapproved uses and dosages of Bextra.

60.    In or about June 2002, in or about November 2003, and at other times, **PHARMACIA** managers instructed members of the sales force to send out unsolicited letters known as Medical Inquiry Letters (also known as the "Medical Letter" or "Medical Inquiry Response") to, among others, groups of physicians who prescribed a lot of Vioxx. These letters were issued by **PHARMACIA** as if they were responses to physicians' unsolicited inquiries and contained medical information relating to unapproved uses and dosages of Bextra.

61.    **PHARMACIA** managers instructed their sales teams to send the Medical Inquiry Letters to top Vioxx prescription writers who had not made requests for the letters, including by instructing their teams to send them to "Every Vioxx Loyalist," even though they knew it was improper to send these letters unsolicited and knew that the letters, which appeared to be a response to an unsolicited inquiry, were a disguise for improper promotion.

62.    At the direction of their managers, **PHARMACIA** sales representatives sent unsolicited Medical Letters with information to support the use of Bextra for unapproved uses and dosages to physicians.

63.    In the Medical Letters, **PHARMACIA** did not disclose the FDA's safety concern with the use of Bextra for unapproved uses, such as acute pain, and unapproved dosages. Nor did **PHARMACIA** disclose that the FDA raised a concern about the use of Bextra in surgery

15

based upon the CABG I study and the excess of serious cardiovascular thromboembolic events in the Bextra (after parecoxib) arm of the study.

### G.    PHARMACIA's Off-Label Promotion of Bextra By Distribution of Samples for Unapproved Uses/Doses

64.    **PHARMACIA's** sales force provided promotional samples of Bextra to surgeons and other medical prescribers who had no FDA-approved use for the Bextra samples, including by providing dosages that were unapproved for the uses for which the physicians were expected to use the samples.

65.    **PHARMACIA** distributed samples of Bextra, including 20 mg samples, to physicians whom **PHARMACIA** knew would not prescribe it for approved uses or dosages, such as oral surgeons, dentists and other surgeons.

66.    **PHARMACIA** allocated approximately 25% of all Bextra samples to 20 mg samples, even though **PHARMACIA** knew that the primary dysmenorrhea market (the only market for which Bextra at 20 mg was FDA-approved) was only a tiny percentage of the total potential sales (approximately 1-3%).

67.    **PHARMACIA** allocated 20 mg samples to sales representatives who did not call on any type of doctor who treated primary dysmenorrhea and thus who had no FDA-approved use for 20 mg doses of Bextra.

68.    **PHARMACIA** used a national computer program to direct the sales force on how to utilize these free samples, which instructed sales representatives to increase use of 20 mg samples for certain physicians, such as rheumatologists and orthopaedic surgeons, even though these physicians had no approved use for such samples.

16

**H.    Use of Purportedly Independent Continuing Medical Education to Promote Bextra for Unapproved Uses and Dosages**

69.    **PHARMACIA** also funded purportedly independent continuing medical education programs ("CME") with the stated purpose of disseminating messages promoting Bextra for unapproved uses, including specifically for acute pain and surgical pain.

70.    **PHARMACIA** accomplished this by incorporating CME planning into its marketing messaging strategy for Bextra. Among the practices **PHARMACIA** employed was to hire advertising agencies to prepare standard promotional slides for Bextra, and then had these slides certified by other vendors as "CME." It then caused these Bextra slide sets to be distributed to the "advocates" it had trained so that they could use the slides for CME events as well.

71.    **PHARMACIA's** headquarters-based marketing teams also created annual medical education plans in which they reflected the intention to "leverage CME" to provide data beyond the approved label. The plans listed the specific messages for Bextra to be relayed, including messages such as Bextra power for "Acute pain, Opiod-sparing."

72.    In 2002 alone, **PHARMACIA** funded CME programs for Bextra designed to reach 30,000 physicians, including in many instances with the unapproved messages.

**I.    Promotion of Bextra for Unapproved Uses and Dosages by Supporting and Drafting Publications**

73.    **PHARMACIA** also promoted Bextra for unapproved uses and dosages through a "publication strategy" whereby **PHARMACIA** initiated, funded, sponsored and sometimes drafted or hired medical writer vendors to draft articles about Bextra for unapproved uses and dosages in order to promote these uses and dosages, without always appropriately disclosing

**PHARMACIA's** role in the process.

74.     **PHARMACIA** implemented a "manuscript development" process whereby a core team at **PHARMACIA** would plan potential publications and recruit authors for them.   Some of those listed in the publication plans were listed with authors as "TBD" (to be determined) or "TBC" (to be chosen).

75.     **PHARMACIA** also created an overall list of its goals for this process, which included relaying unapproved messages for Bextra such as "Acute Pain: BEXTRA Provides Rapid, Powerful Pain Relief in surgical pain."

## COUNT ONE

**(Introduction into Interstate Commerce of a Misbranded Drug:
21 U.S.C. §§ 331(a), 333(a)(2) & 352(f))**

76.    The allegations contained in paragraphs 1 through 75 are realleged and incorporated herein as if set forth in full.

77.    Between February 2002 and April 2005, in the District of Massachusetts and elsewhere, the defendant,

**PHARMACIA & UPJOHN COMPANY, INC.**

with intent to defraud and mislead, did introduce, deliver for introduction, and cause the introduction into interstate commerce, into Massachusetts and elsewhere, quantities of Bextra, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(g), which was intended for use for the treatment of acute pain, surgical pain, other unapproved uses, and at unapproved dosages, which was misbranded within the meaning of 21 U.S.C. § 352(f)(1), in that it lacked adequate directions for such uses.

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(f)(1).

## FORFEITURE ALLEGATIONS

1.      As a result of the violation of Title 21, United States Code, Sections 331(a),

333(a)(2), and 352(f)(l) set forth in this information, defendant,

### PHARMACIA & UPJOHN COMPANY, INC.

shall forfeit to the United States of America any quantities of Bextra, which between February,

2002, and April 5, 2005, were misbranded when introduced into or while in interstate commerce,

or while held for sale (whether or not the first sale) after shipment in interstate commerce, or

which may not, under the provisions of Title 21, United States Code, Section 331, be introduced

into interstate commerce.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the

defendant:

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third party;

      (c)      has been placed beyond the jurisdiction of the Court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be divided without

            difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the property subject to

forfeiture, that is $105,000,000.

All pursuant to Title 21, United States Code, Sections 334 and 853 and Title 28,

United States Code, Section 2461(c).

20

MICHAEL K. LOUCKS
ACTING UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


EUGENE THIROLF
DIRECTOR
OFFICE OF CONSUMER LITIGATION
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

SARA MIRON BLOOM
Assistant U.S. Attorney
District of Massachusetts


SUSAN M. POSWISTILO
Assistant U.S. Attorney
District of Massachusetts

21

Case 1:09-cr-10258-DPW    Document 1-2    Filed 09/02/2009    Page 1 of 2

✎JS 45  (5/97) - (Revised USAO MA 11/15/05)

<u>Criminal Case Cover Sheet</u>                  <u>U.S. District Court - District of Massachusetts</u>

Place of Offense:  <u>MA</u>           Category No. <u>II</u>       Investigating Agency  <u>HHS, FBI, FDA</u>

City  <u>Boston</u>                Related Case Information:     **09 CR 10258 DPW**

County  <u>Suffolk</u>              Superseding Ind./ Inf. _____     Case No. _____
                                  Same Defendant _____     New Defendant _____
                                  Magistrate Judge Case Number _____
                                  Search Warrant Case Number _____
                                  R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  <u>Pharmacia & Upjohn Company, Inc.</u>        Juvenile    ☐ Yes    ☒ No

Alias Name  <u>n/a</u>

Address  <u>235 E. 42nd Street, New York, NY 10017</u>

Birth date (Year only):  <u>n/a</u>    SSN (last 4 #):  <u>n/a</u>    Sex __    Race:  <u>n/a</u>    Nationality:  <u>n/a</u>

Defense Counsel if known:   <u>Brien T. O'Connor</u>        Address:  <u>Ropes & Gray, One International Place</u>
                                                          <u>Boston, MA 02110-2624</u>
Bar Number: _____

**U.S. Attorney Information:**

AUSA  <u>Susan M. Poswistilo and Sara Miron Bloom</u>    Bar Number if applicable  <u>552351 (Bloom)</u>

Interpreter:     ☐ Yes   ☒ No        List language and/or dialect: _____

Victims:  ☒ Yes  ☐ No   If Yes, are there multiple crime victims under 18 U.S.C. §3771(d)(2)  ☒ Yes ☐ No

Matter to be SEALED:    ☐ Yes   ☒ No

       ☐ Warrant Requested        ☒ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____
☐ Already in State Custody _____ ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____ on _____

Charging Document:    ☐ Complaint    ☒ Information    ☐ Indictment

Total # of Counts:    ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony  <u>1</u>

Continue on Page 2 for Entry of U.S.C. Citations

☒      I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
       accurately set forth above.

Date: <u>9/3/09</u>            Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 11/15/05)  Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**     Pharmacia & Upjohn Company, Inc. _____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 21/§§ 331(a); 333(a)(2); 352 | Introduction into Commerce of a Misbranded Drug | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |

ADDITIONAL INFORMATION: